E-FILED
Friday, 25 September, 2026 03:03:15 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| **ARASH GHAYOORI,**<br>**Plaintiff,**<br><br>v.<br><br>**TIMOTHY L. KILLEEN, and the UNIVERSITY OF ILLINOIS BOARD OF TRUSTEES,**<br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No. 23-cv-2116** |

**OPINION**

**COLLEEN R. LAWLESS, United States District Judge:**

This case arises out of the revocation of Plaintiff Arash Ghayoori's Ph.D. by the University of Illinois Board of Trustees after a review process was conducted to investigate allegations of plagiarism in Plaintiff's Ph.D. Dissertation. For the following reasons, Defendants' Motion for Summary Judgment (Doc. 46) is GRANTED.

## I. FACTUAL BACKGROUND[1]

### A. University Policy

The University of Illinois's Policy and Procedures on Integrity in Research and Publication (the "Policy" or "University Policy") outlines the steps and procedures for investigation into allegations of academic and research misconduct. (Doc. 46 at ¶ 1). When the University receives a complaint, the Research Integrity Officer ("RIO") and a

[1] The following facts are summarized from Defendants' Statement of Undisputed Material Facts (Doc. 46) and Plaintiff's Statement of Additional Facts (Doc. 60). Plaintiff admitted to all but five of Defendants' 210 paragraphs of fact.

Unit Executive Officer ("UEO") begin an "Assessment," wherein they evaluate whether the complaint concerns "research misconduct" and whether the allegations are credible and specific. (*Id.* at ¶ 2). "Research misconduct" includes fabrication, falsification, and plagiarism, such as the appropriation of another person's ideas, words, or results without credit. (*Id.* at ¶ 3). The RIO and UEO then make recommendations to the Dean, who decides whether there is sufficient evidence to warrant an "Inquiry." (*Id.* at ¶ 5).

The Inquiry entails preliminary fact-finding and information-gathering conducted by a multi-person panel, each member of whom the Respondent (the accused) may object to. (*Id.* at ¶¶ 6–8). Once the panel is selected, the RIO notifies the Respondent of its members in writing; the allegations against the Respondent, and Respondent's responsibilities and rights throughout the process. (*Id.* at ¶ 9). At its discretion, the panel may interview the Respondent, the Complainant, key witnesses, or examine relevant materials, or any other steps they believe are appropriate in determining whether an "Investigation" is warranted. (*Id.* at ¶¶ 10–11). If so warranted, the panel issues an "Inquiry Report," which is shared with the Vice Chancellor for Research and Innovation ("VCR"), the Dean, the Respondent, and any other appropriate parties. (*Id.* at ¶¶ 12–13). The Respondent then has the opportunity to submit written comments to the VCR, who decides whether to order the Investigation. (*Id.* at ¶ 13–14). Notice of the Investigation and Notice of the Respondent's rights and responsibilities are provided to the Respondent. (*Id.* at ¶ 15).

A new multi-person panel conducts the Investigation, each member of whom the Respondent may object to. (*Id.* at ¶¶ 16–17). The panel is tasked with determining by a preponderance of the evidence whether the alleged research misconduct occurred. (*Id.* at ¶ 18). In making that determination, the panel develops a factual record and determines whether there are additional instances of possible research misconduct and, if so, whether to broaden the scope of the review beyond the initial allegations. (*Id.* at ¶¶ 19–20). The panel interviews the Respondent and those witnesses identified by the Respondent as having relevant information, and transcripts of each interview are provided to the respective interviewee for opportunity to make corrections. (*Id.* at ¶ 21). The panel ultimately drafts an Investigation Report and provides the Respondent with an opportunity to submit written comments, which are then incorporated into the Report. (*Id.* at ¶¶ 22–23). The Investigation Report is then submitted to the VCR who makes its own recommendations; all of which is submitted to the Chancellor. (*Id.* at ¶¶ 24, 26). The Chancellor determines whether research misconduct has been proven by a preponderance of the evidence and may impose sanctions. (*Id.* at ¶ 26).

As relevant here, the University Policy contains provisions concerning evidence preservation, including that the RIO "shall undertake reasonable and practical steps to secure all research records and other evidence needed to conduct a Research Misconduct proceeding, to inventory those materials, and to sequester them in a secure manner." (*Id.* at ¶ 27). Moreover, the Policy requires the RIO to notify the Respondent of the following rights and responsibilities (as referenced earlier):

1. To be notified in writing of any new allegations, not addressed in the Inquiry or in the initial notice of Investigation, within a reasonable time after the determination to pursue those allegations;
2. To be interviewed during the Investigation, have the opportunity to correct transcripts of the interview, if made, included in the record of the Investigation;
3. To have any witness interviewed during the Investigation whom the Panel determines has been reasonably identified by the Respondent as having information on relevant aspects of the Investigation;
4. To submit written statements to the Panel;
5. To be accompanied by personal legal counsel or any advisor of choice as set forth in paragraph V.5 of this Policy;
6. To receive a copy of the draft Investigation Report and, concurrently, a copy of, or supervised access to the evidence on which the draft Report is based, and be notified that any comments to the draft Report must be submitted within 30 calendar days of the date on which the draft Report was received and that the comments will be included within the final version of the Report.

(*Id.* at ¶ 31).

**B. Background and Review Process into Plaintiff**

Plaintiff was a Ph.D. student in the University's Department of Industrial & Systems Engineering in the research group of Professor Rakesh Nagi. (*Id.* at ¶ 33). Plaintiff took a leave of absence in Spring 2019 and worked with a company called Cytel Health. (*Id.* at ¶ 34). He re-enrolled in Fall 2019, completed his preliminary exam, and successfully defended his Ph.D. Dissertation on July 24, 2020, titled "Budget allocation and optimal use of resources in four different contexts: Data centers, viral marketing, recommendation systems, and the fight with the HIV epidemic." (*Id.* at ¶¶ 35–36). He earned his Ph.D. in December 2020. (*Id.* at ¶ 37). He elected to have his Dissertation available only to University personnel and not for public view. (*Id.* at ¶ 38). Plaintiff and Professor Nagi later submitted a manuscript titled "A Markov model examining the intervention effects

on the HIV prevalence/incident amongst the overall population" to the *Socio-Economic Planning Sciences* journal, published online as of 2021 ("2021 SEPS Publication"). (*Id.* at ¶ 39).

On May 6, 2021, an employee at Cytel, Louis Dron, emailed an administrator at Illinois State University reporting potential plagiarism in Plaintiff's Dissertation and the 2021 SEPS Publication. (*Id.* at ¶ 40). The email was delivered to Dr. Chris Lehmann as the RIO for the University of Illinois. (*Id.* at ¶ 41). The email expressed concerns that Plaintiff plagiarized from a publication in *BMJ Global Health* ("BMJ Publication"). (*Id.* at ¶¶ 42–43). The Assessment was conducted, and after review of the available evidence, including Plaintiff's Dissertation, factual findings were communicated to the Dean of the Grainger College of Engineering, who then determined that an Inquiry was appropriate. (*Id.* at ¶¶ 45–46).

On August 4, 2021, Plaintiff received a letter notifying him that the University initiated an Inquiry, the allegations against him, and his right to submit a written response. (*Id.* at ¶¶ 48–50). Plaintiff submitted a response the next day which addressed the 2021 SEPS Publication but not his Dissertation. (*Id.* at ¶¶ 51–52). Plaintiff did not submit any objections when he was informed of the members on the Inquiry panel. (*Id.* at ¶¶ 53–54). Plaintiff's then-counsel submitted an additional response to the allegations. (*Id.* at ¶ 55).

The Inquiry panel met six times and reviewed Plaintiff's responses and the available evidence. (*Id.* at ¶ 56). The panel utilized a software platform called iThenticate

"to compare the text of [Plaintiff's] Dissertation against the other publications contained in the iThenticate content database, which produced an iThenticate summary report listing sources identified as containing similar or identical language as Plaintiff's Dissertation that pre-dated Plaintiff's PhD defense on July 24, 2020." (*Id.* at ¶ 57). The iThenticate report identified the BMJ Publication and a dissertation from Sabin Nsanzimana, each of which Plaintiff said he contributed analysis and writing, as well as several other unrelated publications that predated Plaintiff's Dissertation, including publications from Shang ("Shang Publication"), Lai ("Lai Publication"), and Grant ("Grant Publication"). (*Id.* at ¶ 59). The panel provided Plaintiff with the iThenticate report and requested his response. (*Id.* at ¶ 60). After review of the report, Plaintiff submitted a letter that "did not respond in any way about the Shang Publication, Lai Publication, Grant Publication, or Grant Dissertation that were identified by the iThenticate Report as potential sources of plagiarism." (*Id.* at ¶¶ 61–63). The panel prepared an Inquiry Report that contained findings of fact that, in sum, substantiated suspicions of plagiarism, and recommended an Investigation. (*Id.* at ¶¶ 67, 69, 72). Plaintiff received a copy of the final report on October 29, 2021, and submitted a response to it in November. (*Id.* at ¶¶ 73, 75). Plaintiff later testified that his response did not address the substance of the findings or the plagiarism allegations concerning the publications. (*Id.* at ¶ 76).

Plaintiff was informed in December 2021 that the Vice Chancellor determined an Investigation would be conducted. (*Id.* at ¶ 77). An Investigation Panel was appointed.

(*Id.* at ¶¶ 77–79). Plaintiff was also informed of his right to request the panel interview witnesses, but he did not make any such requests. (*Id.* at ¶¶ 21, 81, 116, 206). In February 2022, Plaintiff emailed the panel, providing information concerning the BMJ Publication and the 2021 SEPS Publication, but not the Shang, Lai, or Grant Publications or Grant Dissertation. (*Id.* at ¶¶ 83–84). Plaintiff was interviewed in April and thereafter provided a transcript of the interview for his edits. (*Id.* at ¶¶ 85–87). He stated he "made an honest mistake in forgetting to properly cite my own publications, as well as two others in my dissertation." (*Id.* at ¶ 88). Afterwards, Plaintiff received a letter with several follow-up questions requesting early drafts and original notes from his BMJ manuscript. (*Id.* at ¶ 90). Plaintiff responded by email with attachments and a statement that his notes concerning his Dissertation were preserved in his University Box account. (*Id.* at ¶ 92). The University's personnel indicated nothing was in the Box account as of May 21, 2021, and Plaintiff responded that was a "mistake" as he recalled maintaining and accessing files within the account. (*Id.* at ¶ 98).

The Investigation Panel expanded the scope of the allegations after review of the evidence to include "plagiarized information including text and figures in the 2021 SEPS Publication from Grant's Publication and Grant's Dissertation; and fabricated and falsified figures in the 2021 SEPS Publication." (*Id.* at ¶ 93). The allegations were later expanded another time. (*Id.* at ¶ 106). Plaintiff was provided with notice and opportunity to respond to each new set of allegations every time the scope was expanded. (*Id.* at ¶¶ 94, 101–103, 106–107). The Panel provided Plaintiff with a draft of the Investigation

Report and an opportunity to respond. (*Id.* at ¶¶ 113–115). Plaintiff's response "noted that Dr. Mills, Dr. Thorlund, Dron, [Jay] Park, and Dr. Grant were not interviewed but did not request that the Investigation Panel conduct such interviews."[2] (*Id.* at ¶ 116). Plaintiff received notice of the panel's November 30, 2022 final report, which concluded Plaintiff engaged in research misconduct, contained factual findings, and recommended the Senate Committee on Student Discipline consider Plaintiff's Ph.D. revocation. (*Id.* at ¶¶ 120–125). Chancellor Robert J. Jones accepted the Report and referred the matter to the Senate Committee for consideration of sanctions, including revocation. (*Id.* at ¶¶ 127, 129). Plaintiff was notified of the Chancellor's decision. (*Id.* at ¶ 128).

On February 13, 2023, Plaintiff appealed the decision on procedural grounds to University President Timothy L. Killeen. (*Id.* at ¶¶ 130–131). After having received a Dr. Lehmann's memorandum detailing the procedural steps taken and Plaintiff's objections and statements, President Killeen denied the appeal after determining the proceedings did not deviate from University Policy to the extent that Plaintiff was denied due process. (*Id.* at ¶¶ 132–142). Plaintiff was notified of the decision. (*Id.* at ¶ 143).

Plaintiff was also informed that the Office for Student Conflict Resolution had convened a Panel of the Subcommittee on Graduate Student Conduct for a sanctions-only hearing. (*Id.* at ¶¶ 144–145). He was given an opportunity to object to members on the panel, and he did, with one objection being granted. (*Id.* at ¶¶ 148–149). Plaintiff attended the panel hearing with his attorney and gave an opening statement and responded to

---

[2] These four individuals are related to the BMJ Publication. (Doc. 46 at 61).

questions from the panel. (*Id.* at ¶¶ 150, 151). Plaintiff was later notified that the Subcommittee affirmed the recommended sanction of revocation of his Ph.D. (*Id.* at ¶ 152). An appeal committee met, reviewed, and affirmed the decision. (*Id.* at ¶ 153). On July 21, 2023, Plaintiff was notified that the Board of Trustees of the University revoked his Ph.D. (*Id.* at ¶ 155).

## II. PROCEDURAL BACKGROUND

Plaintiff initiated this action on May 24, 2023. (Doc. 1). He filed his Third Amended Complaint on August 9, 2024 (Doc. 23), which survived Defendants Timothy L. Killeen's and the University of Illinois Board of Trustees' Motion to Dismiss (Doc. 35). The Complaint contains a due process and a breach of contract claim against Killeen and the University, respectively. Plaintiff seeks damages and reinstatement of his Ph.D. On June 1, 2026, Defendants moved for summary judgment. (Doc. 46). On July 22, 2026, the Court granted Defendants' Motion to Deem Admitted Defendants' First Set of Requests for Admission, Nos. 1 through 63, under Rule 36(a)(2) of the Federal Rules of Civil Procedure. The Court has considered the response and reply briefs filed thereafter. (Docs. 59 - 62).

## III. DISCUSSION

### A. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A genuine

issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008) (quotation omitted). The Court construes all inferences in favor of the nonmovant, *Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 925 (7th Cir. 2011), but an inference supported only by "speculation or conjecture" cannot raise a genuine issue of material fact, *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012). Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer*, 518 F.3d at 484 (quotation omitted).

**B. Due Process**

The Fourteenth Amendment's Due Process Clause guarantees that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Here, the parties agree that Plaintiff has a protected property interest in his degree. Given this protection, the University "may not withdraw [it] on grounds of misconduct absent[] fundamentally fair procedures to determine whether the misconduct has occurred." *Doe v. Purdue*, 928 F.3d 652, 663 (7th Cir. 2019) (quoting *Goss v. Lopez*, 419 U.S. 565, 574 (1975)). "Determining what is fundamentally fair is always a context-specific inquiry," *id.* (citing *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 86 (1978)), but any hearing "must be a real one, not a sham or pretense," *id.* (quotation omitted).

In the university context, when a plaintiff claims he was subjected to biased decision making, it is presumed that "university administrators are 'honest and impartial.'" *Id.* at 664 (quoting *Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 675 (7th Cir. 2016)). To rebut that presumption, the plaintiff carries a "heavy" burden, "typically requiring evidence that 'the adjudicator has a pecuniary interest in the outcome of the case, or that he was previously the target of plaintiff's abuse or criticism.'" *Id.* (quoting *Hess*, 839 F.3d at 675). The plaintiff "must 'lay a specific foundation of prejudice or prejudgment, such that the probability of actual bias is too high to be constitutionally tolerable.'" *Id.* (quoting *Hess*, 839 F.3d at 675).

"[T]he hallmarks of procedural due process are notice and an opportunity to be heard." *Pugel v. Bd. of Trs. of the Univ. of Ill.*, 378 F.3d 659, 662 (7th Cir. 2004). "Notice is constitutionally adequate if it is reasonably calculated to apprise interested parties of the proceeding and afford them an opportunity to present their objections." *Head v. Chicago Sch. Reform Bd. of Trs.*, 225 F.3d 794, 804 (7th Cir. 2000). Plaintiff admits he received abundant notice throughout the proceedings against him, and it is clear from any review of the record that notice was constitutionally adequate. (*See, e.g.*, Doc. 46 at ¶¶ 48–50, 77, 79–80, 94, 101–03, 106–07, 120–124, 128). He contends only that President Killeen, who denied Plaintiff's appeal, relied upon some evidence that Plaintiff states he never received notice of.

Recall that Killeen was provided with a memorandum to aid in his review of the record for Plaintiff's procedural appeal, which generally summarized the history of the

underlying proceedings. Killeen was asked at a deposition whether the memorandum was provided to Plaintiff, and Killeen responded, "I don't know if this material was—was provided to him or not," and later, "I have no basis to say that it was ever given." (Doc. 46-22 at 47:25–48:9). Plaintiff misrepresents this statement, framing the quotation as, "No, I have no basis to say that it [i.e., the new and additional evidence] was ever given." (Doc. 59 at 3). Plaintiff never elaborates on what evidence is *new* and *additional*, nor does he address the content of the memorandum, having been attached to Defendants' Motion for Summary Judgment as Exhibit A-10 (Doc. 46-11). Rather, Plaintiff has admitted to the content of the memorandum as described in Defendants' statement of facts, (Doc. 46 at ¶¶ 132–139), including that the memorandum discussed the procedural steps the University followed, and that Killeen's review was limited to whether a substantial deviation from those procedural steps occurred. Notwithstanding the apparent misrepresentation, Plaintiff has waived argument on this point. *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is appropriate if a dispute about a material fact is not "genuine," meaning that there is insufficient evidence for a reasonable jury to return a verdict for the nonmovant).

As with notice, Plaintiff was provided abundant opportunities to object or present his side of the story. (*See, e.g.*, Doc. 64 at ¶¶ 51, 55, 62, 75, 83–85, 91). Specifically, Plaintiff submitted 10 written statements to the Inquiry Team and Investigation Panel, testified

before the Investigation Panel, and responded to follow-up requests several times after his interview. As Defendants explain, Plaintiff never addressed the plagiarism allegations with respect to the Shang Publication and Lai Publication in his written responses and even admitted that his Ph.D. dissertation failed to credit other authors. (Doc. 46 at 52). He testified that he had copy-pasted portions of other sources into his notes and then copy-pasted those unattributed portions from his notes into his dissertation. (*Id.* at ¶¶ 123, 158).

Additionally, Plaintiff was provided with the opportunity to identify witnesses for the Investigation Panel but did not do so. (Doc. 64 at ¶¶ 81, 139, 206). Plaintiff cannot now complain that the Panel should have interviewed particular witnesses when he did not make use of his opportunity to request interviews.[3] Furthermore, Plaintiff speculates that the University "destroyed" research-related evidence contained in electronic files in Plaintiff's University Box account that he believes would have aided in his defense. No evidence, however, substantiates his speculation and, in fact, Plaintiff admits the University sought to sequester and preserve Plaintiff's electronic records, but his Box account was empty. (*Id.* at ¶¶ 134, 177–179). A cybersecurity analyst confirmed the Box account had been preserved but Plaintiff had "no files uploaded to it." (*Id.* at ¶ 179).[4] And, finally, though Plaintiff complains about a "never before done" sanctions-only hearing,

---

[3] Some members of the Panel reasonably decided against interviewing certain witnesses because the available documentary evidence of plagiarism was "overwhelming," the information the witnesses would have provided was duplicative, or the information was otherwise unnecessary. (Doc. 64 at ¶¶ 204–210).

[4] Even assuming Plaintiff's access to "critical evidence" was limited in this respect, he had repeated opportunities to defend himself and raise the issue to the University. *See Wang v. Bd. of Trs. of the Univ. of Ill.*, 612 F. Supp. 3d 739, 747 (N.D. Ill. 2020).

Plaintiff was afforded notice of the hearing's procedures, opportunity to object to panel members, and opportunity to be heard during the hearing. (Doc. 48 at ¶¶ 146–154).

In summary, Plaintiff has cited no evidence tending to indicate that any of the process he was afforded was a "sham." *See Purdue Univ.*, 928 F.3d at 663. The weight of the evidence demonstrates that the University's procedures were sufficiently fair to comport with due process principles. *See id.* Consequently, summary judgment is appropriate.

**C. Breach of Contract**

A breach of contract claim requires a plaintiff to allege: "(1) the existence of a valid and enforceable contractual promise, (2) a breach of that promise, (3) plaintiff performed his contractual obligations, and (4) resultant damages." *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 858 (7th Cir. 2019). "Illinois courts have expressed a reluctance to interfere with academic affairs and have held that a student's breach of contract claim must involve decisions that were arbitrary, capricious, or made in bad faith." *Id.* (citing *Raethz v. Aurora Univ.*, 346 Ill. App. 3d 728, 805 (2d Dist. 2004). This means that the University must have disciplined Plaintiff "without any rational basis," not simply that the University's judgment was unwise. *Id.* (citing *Frederick v. Northwestern Univ. Dental School*, 247 Ill. App. 3d 464, 471–72 (1st Dist. 1993)).

Plaintiff does not meaningfully address his breach of contract claim in his oppositional response. Instead, it appears he has conflated his burden of showing the University's decisions were "arbitrary, capricious, or made in bad faith," with his due

process claim. (*See, e.g.*, Doc. 59 at 2–3, 11 (arguing that denial of due process was arbitrary and capricious)). Plaintiff never addressed the elements of his breach of contract claim, and so has waived argument and summary judgment. *Schaefer*, 839 F.3d at 607 ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."); *Mahran v. Advocate Christ Med. Ctr.*, 12 F.4th 708, 713 (7th Cir. 2021) ("[A] party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered.").

In any event, Defendants correctly contend that Plaintiff has failed to demonstrate the University's breach of contract or his substantial performance. To the extent Plaintiff believes the University's decision not to interview certain witnesses was a breach, as addressed above, Plaintiff never requested any interviews despite having been informed of his right to do so per University Policy. (Doc. 64 at ¶¶ 31, 81, 139, 206). Plaintiff, moreover, did not substantially perform. He alleges a contractual agreement with the University that required him to "abide by [the University]'s rules, regulations, policies, and procedures" and "prepare a Dissertation." (Doc. 23 at ¶¶ 59–61). Because he plagiarized and fabricated research in his dissertation, he failed to abide by his own contractual requirements. (*Id.* at ¶¶ 122–124, 156–158, 160, 164, 167, 172).

Finally, there is no evidence of the University's bad faith. Recall that the relevant question is not whether the University "exercised its academic judgment unwisely," but instead, whether it "disciplined a student without any rational basis." *Columbia Coll. Chi.*, 933 F.3d at 858. Here, evidence of Plaintiff's research misconduct was substantial and is

undisputed, and Defendants have adequately and reasonably explained their procedural decisions throughout the extensive investigation. "[A] court may not override the academic decision of a university 'unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.'" *Raethz*, 346 Ill. App. 3d at 732 (quoting *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 225 (1985)). Plaintiff has not carried his heavy burden here. *Id.*

## IV. CONCLUSION

Based on the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 46) is GRANTED. Clerk is directed to enter Judgment in favor of Defendants and close this case.

ENTER: September 25, 2026

COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE